UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-60390-CIV-SINGHAL

JEFFERSON BOURDEAU, *et al.*,
individually and on behalf
of all others similarly situated,

      Plaintiffs,

vs.

PROFESSIONAL PARKING
MANAGEMENT CORPORATION,

      Defendant.

_____/

## ORDER

Plaintiffs Jefferson Bourdeau, James Edgar, Stephanie Hall, David Rohbeck, and Andrew Valdes all entered and used parking lots owned by Professional Parking Management Corporation ("PPM"). Plaintiffs Bourdeau, Hall, and Valdes paid for parking but overstayed. Plaintiffs Edgar and Rohbeck did not pay. All five were mailed bills for parking without paying or for overstaying. They now allege that by obtaining their addresses from the Department of Motor Vehicles (DMV) and mailing them bills for services rendered, PPM violated the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ("DPPA"); violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); violated the Florida Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.*, Florida Statutes (2025) ("FDUTPA"); and engaged in unjust enrichment. (Comp. (DE [1]). In this class action suit, Plaintiffs seek damages as well as injunctive and declaratory relief. *Id.* at 20. PPM moved to dismiss the Complaint, *see* (M. Dism. (DE [23])), and that motion is fully briefed and ripe for review.

I.      BACKGROUND

The facts are straightforward. PPM monitors vehicle parking lots and sends notices to vehicle owners who did not pay for parking. (DE [1] ¶¶ 1-2). Using license plate readers, PPM records the license plates of vehicles as they enter and leave the lot. *Id.* Throughout the lot, PPM posts QR codes drivers can scan to pay for parking. *Id.* Also posted, and available upon scanning, are the contractual terms obligating the driver to pay if he or she stays longer than 15 minutes. (Notice of Non-Compliance (DE [1-2])); (Contractual Terms (DE [23-1)]); (Website Contractual Terms (DE [25] at 18 n.9)).[1] If a driver does not pay for parking, PPM reaches out to the DMV and, based on the license plate information, requests the vehicle owner's records, including name and address. *Id.* ¶ 60. PPM then sends the vehicle owner the parking bill. *Id.* ¶ 25.

On November 21, 2024, Bourdeau parked at a lot monitored by PPM, located at 73 Krog Street NE, Atlanta, Georgia 30307. *Id.* ¶ 16. Bourdeau paid for an hour of parking but parked for nearly two hours. *Id.* PPM sent Bourdeau a bill with a fee of $70 for overstaying and failing to pay. *Id.* ¶ 26.

Edgar drove his golf cart into a PPM-monitored lot at 300 SW 2nd Street, Fort Lauderdale, Florida 33312 to make some minor mechanical repairs on the cart. *Id.* ¶¶ 17, 27. He left after 21 minutes without paying. *Id.* ¶ 27. He received a fee of $125 for not paying. *Id.*; (DE [1-2]). Later, he received a letter from a collections agency, seeking payment for the fee. (DE [1-4]).

Hall parked at a lot near 2701 Biscayne Boulevard, Miami, Florida 33137, and she paid via app for an hour of parking. (DE [1] ¶¶ 16, 31). Although she did not receive a

---

[1] Plaintiffs argue that they did not consent to the contractual terms. But the posted contractual terms indicate that drivers enter into a contract with PPM by parking in the lot.

notification that her time was expiring, a week later, PPM sent her a bill for overstaying. *Id.* ¶ 31. She does not allege that she left within the hour she paid for.

Rohbeck entered a PPM-monitored lot at 219 S. Andrews Avenue, Fort Lauderdale, Florida 33301. *Id.* ¶ 17. After driving around the lot looking for an open spot for 22 minutes, Rohbeck left. *Id.* ¶ 29. PPM then sent Rohbeck a fine for $125 for not paying for parking.

Valdes paid for two hours of parking at a PPM-monitored lot at 902 North Flagler Drive, Fort Lauderdale, Florida 33304. *Id.* ¶¶ 16, 30. He left after parking for two hours and one minute. PPM sent him an $80 bill for overstaying. *Id.* ¶ 30.

Plaintiffs allege that they paid the bills that PPM sent them. *Id.* ¶ 43.

Prior to beginning the legal discussion of this case, it bears noting that Plaintiffs do not like Defendant's business model, yet they attempted to take full advantage of it. In their Complaint, Plaintiffs allege at paragraph 2, "Instead of conventional entry and exit gates where drivers would normally stop to pay, small signs bearing QR codes replace these barriers, shifting the burden onto consumers. This 'drive in and drive out' model leaves many drivers unaware of the need to make a payment, thereby setting the stage for a subsequent notice demanding an 'outstanding balance' that far exceeds the originally advertised parking fee." (DE [1] ¶ 2). Maybe Defendant's business model places the burden on customers. Maybe it frees customers up to exit and enter freely rather than going through a gate and relying on the gate to actually work. Those are things the Court does not know because courts do not run businesses. What the Court does know is that Plaintiffs utilized Defendant's services, under their business model, and left without paying what they owed, only to then complain in the form of a federal lawsuit about the method of collection. In other words, the Court doesn't even get to the DMV record lookup

3

and mailing of bills—the alleged statutory violations—until Plaintiffs here, and ostensibly each of the class members, have used Defendant's property and failed to pay for at least part of that use. Put simply, the alleged statutory violations occur only after Plaintiffs and those they represent have easily met the definition of Theft under Florida Statute § 812.014(1)(a).[2] That definition gives fair notice of the following criminal conduct:

> (1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>   (a) Deprive the other person of a right to the property or a benefit from the property.

*Id.*

Moreover, the DPPA allows disclosure of names and addresses in instances of theft, and in anticipation of litigation, among other things.  Because Plaintiffs do not allege a cognizable injury, this Court finds they lack standing and so thankfully the Court need not address whether PPM violated the DPPA, FDCPA, or FDUTPA (including whether Plaintiffs committed theft).

## II.   LEGAL DISCUSSION

### A. Standing

For standing, Plaintiffs must show: "(1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision." *L.M.P. on behalf of E.P. v. Sch. Bd. of Broward Cnty.*, 879 F.3d 1274, 1281 (11th Cir. 2018). An injury can be considered concrete "if it actually exists—that is, if it is 'real, and not abstract.'" *Hunstein v. Preferred Collection & Mgmt.*

---

[2] The Georgia theft statute is even easier for a prosecutor to meet.  See for example Georgia Code § 16-8-2 entitled "Theft by Taking" which states, "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated."

4

*Servs.*, Inc., 48 F.4th 1236, 1242 (11th Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). Physical injury and financial harm are obvious real injuries, but intangible harm can also be a real injury. *Id.* at 1243. For intangible harms, courts analogize to "longstanding torts" to "determine whether an alleged intangible injury meets the concreteness requirement." *Id.* at 1244 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204–05 (2021)).

When alleging harm, a plaintiff must plead facts showing the actual injury, not just conclusions of law. "Only factual allegations, and not legal conclusions, are relevant to our inquiry, and 'mere conclusory statements . . . do not suffice.'" *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When alleging intangible injuries, the plaintiff must explain "how and why" he was injured. *Id.* at 1241. *See, e.g. Mraz v. I.C. Sys., Inc.*, 2020 WL 7125629, at 1 (M.D. Fla. Dec. 4, 2020) ("Mraz alleged he suffered emotional distress (i.e., 'anger, anxiety, emotional distress, fear, frustration, humiliation, and embarrassment') from ICS' collection attempt. . . . Mraz alleged the how and why of his injury by telling ICS the distress he felt from the letter . . . .").

Plaintiffs allege two types of injury. Plaintiffs claim tangible financial harm from having to pay the bills that PPM sent them. *Id.* at ¶¶ 56, 223. They also allege intangible injuries including invasion of privacy as well as lost time and mental anguish from receiving Defendant's bills and collection letters. *See* (DE [1] ¶¶ 66, 218).

Starting with the financial harm, Plaintiffs fail to allege actual injuries. Their argument is that they were injured by having to pay bills that they owed. Although most of us have felt upset by receiving an unwanted bill, receiving a bill for services accepted is not a legal injury. *Maitland v. Spectrum*, 2019 WL 13072397, at *2 (M.D. Fla. Aug. 22,

2019) (plaintiff was not injured by paying a bill that he owed); *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 85 (2d Cir. 2014) (plaintiff lacked standing because he only paid what he owed). Paying a bill that you owe is the most basic tenet of financial responsibility, not a legal injury.

Plaintiffs Bourdeau, Edgar, Rohbeck, and Baldes acknowledge that they entered PPM's property, stayed there beyond the 15-minute grace period, and did not pay for the entirety of the time they were there. Plaintiff Hall acknowledges she entered PPM's property, stayed there beyond the 15-minute grace period, and she does not allege that she left within the amount of time she paid for. To avoid being defendants in a potential trespass or petit theft action, each of the Plaintiffs owed PPM an outstanding balance for the use of its lot. Receipt of the bill for the unpaid time was not an injury. Neither was the amount of the outstanding balance fee as to any Plaintiff.  It may seem onerous to have to pay $80 for overstaying parking by one minute, but Plaintiff there (Valdes) could have extended his parking before it expired (or simply paid for three hours at the outset). Or he could have attempted to pay immediately after the fact, instead of waiting for PPM to send him a bill.  Or, as clearly outlined in the Parking Contract, he could have taken an appeal where PPM may have withdrawn the charge. These same arguments apply to each Plaintiff.

Plaintiffs Edgar and Rohbeck claim they never actually parked and thus were injured by having to pay for a service they never used. But both acknowledge they were present in the lot beyond the 15-minute grace period. Edgar enjoyed the use of PPM's lot for 21 minutes to fix his golf cart. Edgar had pulled into the parking garage to get out of traffic. He could have pulled into someone's driveway too and not had to deal with defendant's business model, but instead he would have risked having to deal with the

mindset of an individual homeowner. Certainly, it's reasonable to assume he recognized that would be wrong.  So too is it wrong to use the property of a business without expecting to pay. And Edgar too had the right to appeal. But, instead of paying for the time, which he acknowledges would have only cost $3.00, he drove off. (DE [1] ¶ 27). PPM then sent him a bill, including a significant fee for having to seek him out. *Id.* That may be frustrating, but it is not a legally cognizable injury under Article III. Similarly, Rohbeck drove around the lot for 22 minutes before leaving after not finding an available spot. *Id.* ¶ 29. Rohbeck chose to wait for 22 minutes, hoping a spot would open. He could have left immediately after driving around the lot and determining that no spot was available, which certainly took less time than 15 minutes. Instead, he chose to wait and stayed beyond the grace period, accruing a parking charge. And finally, instead of paying for the time he spent waiting, he drove off. He then received a bill for the time he spent in the lot, plus an additional fee because he did not pay at that time.[3] Again, this is not a legal injury. This is the natural consequence of a decision to wait for a parking space and then drive off without paying.

Essentially, all of the Plaintiffs' arguments boil down to a complaint that PPM gives drivers too much responsibility. PPM allows drivers to easily enter and exit its lots, and in exchange drivers must take initiative to pay for their own parking via the posted QR codes. If drivers abuse that trust and drive off without paying for any or all of their parking time, PPM sends a bill, including an extra fee for its efforts. Plaintiffs do not believe they should be trusted with such responsibility. They do not want to have to keep track of their parking. But there are plenty of parking lots available where a gate or parking attendant will ensure that Plaintiffs pay before they leave, thus alleviating them of that great responsibility to

---

[3] Rohbeck too would have been well advised to take an appeal of his parking charge under the explicit terms of the Parking Contract.

remember to pay for what they use.[4] Plaintiffs are not required to use PPM's lots. But when Plaintiffs do use PPM's lots and do not pay, it is not Plaintiffs who have been injured.

Turning to Plaintiffs' intangible injuries, Plaintiffs claim to have suffered mental anguish and loss of time as a result of the bills, as well as violations of their privacy rights. Because receipt of a bill for services rendered is not an injury, spending time examining and paying the bill is not an injury. Neither is mental anguish from receipt of the bill. If mental anguish from receipt of an unwanted bill for services used was a cognizable injury, everyone in America would be suing in federal court on a nearly daily basis.

Plaintiffs also fail to show that PPM's alleged violation of their statutory privacy rights, in and of itself, actually injured them. To adequately allege a statutory violation as an injury, the plaintiff must analogize the statutory violation to a common-law tort cause of action. *Hunstein*, 48 F.4th at 1243. To be sufficiently analogous, the statutory violation must satisfy all the elements of the common-law tort. *Id.* at 1244. Plaintiffs unsuccessfully attempt to analogize PPM's accessing of their DMV records to an invasion of privacy claim. Under Florida law, establishing invasion of privacy requires a physical or electronic intrusion "into a 'place' in which there is a reasonable expectation of privacy." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003); *Spilfogel v. Fox Broad. Co.*, 433 Fed. App'x 724, 727 (11th Cir. 2011) ("Florida law explicitly requires an intrusion into a private place and not merely into a private activity."). Accessing motor vehicle records is not equivalent to an intrusion into a "place." *See Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) ("The City's accessing of Watts's driver's license information

---

[4] Interestingly enough, in Fort Lauderdale at least, the gated parking lots have a much higher hourly charge than unmanned parking spaces. It's the customer's choice in this case to pay now or pay later. But free isn't one of the options.

in the DAVID system is likewise not an intrusion into a 'place.'"). Plaintiffs' claim of intangible harm from PPM's alleged statutory violations is unfounded.

III.    CONCLUSION

Because Plaintiffs fail to allege an injury, they lack standing to bring this suit. Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's [23] Motion to Dismiss is **GRANTED**. Plaintiffs' Complaint (DE [1]) is **DISMISSED WITHOUT PREJUDICE.** The Clerk is directed to **CLOSE** this case, and any pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 19th day of February 2026.

_____
RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies to counsel of record via CM/ECF